**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | | |
|---|---|---|
| **CHERYLE PETTIGREW,** | ) | **CV 07-151-BLG-RFC** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **ORDER GRANTING RMC'S** |
| **ROCKY MOUNTAIN COLLEGE** | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| **Defendant.** | ) | |
| _____ | ) | |

**I.    INTRODUCTION**

In the instant action, Plaintiff Cheryl Pettigrew asserts discrimination claims against Rocky Mountain College ("RMC") pursuant to the Americans With Disabilities Act ("ADA"), the Rehabilitation Act and the Montana Human Rights Act ("MHRA").  Pettigrew claims RMC's failure to accommodate her disabilities forced her to withdraw from the Physician Assistant ("PA") Program.

Presently before the Court is RMC's Motion for Summary Judgment.  *Doc. 10.*  RMC claims it is entitled to judgment as a matter of law because the undisputed facts show that Pettigrew was not (1) "disabled" within the meaning of these Acts, nor was she (2) "otherwise qualified" to continue with the PA Program.  Pettigrew

1

counters that genuine issues of material fact preclude summary judgment as to both of these elements of her discrimination claims.

## II.    FACTUAL BACKGROUND

In the summer of 2003, Pettigrew entered RMC's two-year master's program for Physician's Assistants ("the PA Program").  Physician's assistants practice medicine with the supervision of a physician: conducting physical exams, diagnosing and treating illnesses, ordering and interpreting tests, counseling on preventive health care, assisting in surgery, and writing prescriptions.  Within the physician-PA relationship, physician assistants exercise autonomy in medical decision making and provide a broad range of diagnostic and therapeutic services. http://www.aapa.org/geninfo1.html (last accessed Feb. 10, 2009).

By her own account, Pettigrew struggled in her classes because she had a hard time understanding the material and processing test questions.  *Doc. 11, RMC's Statement of Undisputed Fact ("SUF"), ¶ 3.*  After she explained this difficulty to instructors Steve Bents and Dr. Scott Murray, RMC allowed Pettigrew to drop out of the PA Program and take refresher courses in the undergraduate school.  *Doc. 17, Plaintiff's Statement of Genuine Issues ("SGI"), ¶ 3.*

Over the next several months, Pettigrew took three courses, completing an undergraduate degree in psychology.  SUF, ¶ 6.  During this period, Pettigrew

2

received assistance from the Services for Academic Success ("SAS"), a program designed to assist, among other things, students with learning disabilities.  SAS recommended Pettigrew take part in tutoring, study groups and counseling.  SGI, ¶¶ 8 & 9.  It was also recommended that she meet with a physician or a psychologist for learning disability diagnosis, but she would have to obtain such services on her own because RMC did not provide that service.  SGI, ¶ 10.  Although Pettigrew had yet to be formally diagnosed with any learning disability, RMC provided her unlimited time and a private room for examinations during this refresher period in the undergraduate school.  SGI, ¶ 4.

Pettigrew was allowed to re-enroll in the PA Program in the summer of 2004 without any procedural hurdles.  She experienced the same problems.  She would hyperventilate because she could not understand the test questions and was frustrated because the exams were timed and she could not finish.  SUF, ¶ 8. Although Pettigrew did not request extended time or any other accommodations during the summer 2004 term, SUF, ¶ 11, she continued to speak with Bents and Murray about her inability to finish the tests.  SGI, ¶ 7.  Pettigrew claims they offered no assistance, so she sought tutoring from other students.  SAS is available only to undergraduates and there was no similar program for PA students with learning disabilities.

Pettigrew had the same problems throughout the fall term of 2004, but still had not asked for a private testing room, additional testing time or any other accommodations.  SUF, ¶ 14.  In mid-December of 2004, Pettigrew received a letter from Bents, the Associate Director of the PA Program, stating her grade point average was below the requisite 2.8 and that she would not be allowed to register for classes during the spring of 2005.  SGI, ¶ 12.  Pettigrew, however, was advised that her academic performance would be reviewed by the Student Progress and Conduct Committee ("SPCC") and that she could ask to be present when the SPCC discussed her case.  Pettigrew was present at the meeting and asked that the SPCC delay consideration of her case pending the results of a learning disability assessment scheduled for the next day.  SUF, ¶¶ 20 & 21.  The SPCC agreed to continue its consideration of Pettigrew's case until its next meeting when the results of her learning disability assessment would be available.  SUF, ¶ 27.

On December 31, 2004, Pettigrew was evaluated by Robert Tompkins, Ed.D. Dr. Tompkins diagnosed Pettigrew with the following DSM-IV disorders: 315.00 Reading Disorder, 314.00 ADHD, predominately inattentive type and 300.22 Specific Phobia, performance anxiety.  SGI, ¶ 12.

The next SPCC meeting was held on January 4, 2004.  After hearing testimony from Pettigrew, her husband, and Cynthia Hutchinson, Pettigrew's

4

counselor at RMC, as well as reviewing Dr. Tompkins' report and Pettigrew's academic record, the Committee offered Pettigrew two options: (1) continue the PA Program into the spring of 2005 with compensation strategies outlined by Dr. Tompkins; or (2) withdraw, without prejudice, from the PA Program, work on Dr. Tompkins' compensation strategies and start the PA Program from the beginning, with appropriate accommodations, in the fall of 2005.  SUF, ¶¶ 31 - 36.  Both options required Pettigrew to be placed on academic probation.  SUF, Exhibit 20.

Pettigrew had no questions or concerns about these options and did not seek any further accommodations.  SUF, ¶ 37.  She chose the second option because she believed it was the best way for her to work on her reading comprehension skills. SUF, ¶ 39.  The second option was also consistent with Dr. Tompkins' recommendation that Pettigrew could continue in the PA Program with treatment and compensation strategies, especially if she prepared herself before returning. SUF, ¶ 40.

After further review of Pettigrew's file, RMC determined that Pettigrew should recommence the program in the summer of 2005 rather than wait for the fall term.  SUF, ¶ 41.  Pettigrew agreed.  RMC also agreed to provide a quiet testing environment and 20% more time to take tests.  SUF, ¶ 45.  RMC offered this accommodation on its own initiative because up to this point Pettigrew had never

requested additional testing time, does not remember asking for a private testing room and had never asked for any other accommodations.  Depo. C. Pettigrew, 75:9-22; 76:17-77:1 (May 5, 2008).

An SPCC meeting for was set for May 10, 2005 so that Pettigrew could report on her progress, discuss her return date and any accommodation issues.  SUF, ¶ 48.  Pettigrew did not attend that SPCC meeting and did not request any further accommodations.  She did not think she could contest the accommodations that had already been granted.  SGI, ¶ 15.  Pettigrew did, however, express concerns via email and telephone to Catherine Gemmiti, the director of the PA Program, SGI, ¶ 16, but did not present these concerns to the SPCC.

Pettigrew began PA Program coursework for the third time in the summer of 2005.  Even with the 20% additional testing time and private testing rooms, Pettigrew still had difficulty understanding test questions, but did not formally request any further accommodations or additional testing time.  SUF, ¶¶ 51 & 52.

In the fall of 2005, Pettigrew met with Dr. Tompkins almost every week.  In early December, Dr. Tompkins wrote a letter explaining his belief that "more liberal" time limits on exams would allow Pettigrew to perform better on tests that are primarily verbal.  Tompkins letter was accompanied by one from Pettigrew requesting unlimited time for examinations.  SGI, ¶ 20.  This is the first time

6

Pettigrew submitted a written request for a specific accommodation.  She believed

unlimited time was the only way she would be able to complete all of the exam

questions and that the PA Program was obligated to provide any accommodation

necessary to ensure her success.  SUF, ¶¶ 61 & 62.

No PA student at RMC has ever been allowed unlimited time for

examinations.  SUF, ¶ 64.  RMC believes that unlimited testing time is incompatible

with the academic integrity of a program designed to educate and train physician

assistants who must accumulate, synthesize and process information quickly and

accurately during emergency situations.  SUF, ¶ 65.  According to RMC, untimed

examinations prohibit it from evaluating whether it is training competent physician

assistants.  SUF, ¶ 66.

As a further justification for its refusal to allow unlimited testing time, RMC

cites the fact that all physician's assistants must pass a timed exam, the Physician

Assistant National Certification Exam ("PANCE"), in order to work as a

physician's assistant.  SUF, ¶ 67.  Although the PANCE guidelines permit up to

double time for individuals who demonstrate a need for such an accommodation,

unlimited testing time is not permitted in any case.  SGI, ¶ 36.

For those reasons, Pettigrew's request for unlimited time was denied.  She

was again afforded a private testing room and 20% additional time for the fall 2005

7

final exams, but she failed one exam and performed poorly on another.  In a letter

dated December 19, 2005, she was told she would be dismissed from the PA

Program.  SGI, ¶ 20.  Pettigrew was further notified that she could file a written

appeal of her termination.

By letter dated January 2, 2006, Pettigrew appealed her termination, claiming

the private testing room and 20% additional time were insufficient accommodations.

SUF, ¶ 74.  Although RMC felt it was justified in dismissing Pettigrew because she

was on academic probation and had failed to maintain the required grade point

average of 2.8, it agreed to allow her to continue with four conditions:

> (1)    that she establish formal and written parameters as to the
> accommodations she receives from the program, working with Dr. Jane
> Van Dyk at RMC's Services for Academic Success who would act as
> a mediator between Pettigrew and the PA Program to clearly outline
> the accommodations she would be granted.  No more than double time
> would be allowed for tests;
>
> (2)    that she work with the PA faculty with respect to remediation and
> retaking of two final exams taken December 1 and 5, 2005;
>
> (3)    that she continue on academic probation; and
>
> (4)    that if she again fails to meet the academic program requirements at the
> end of the semester she would voluntarily withdraw.

SUF, Exhibit 37.  Pettigrew believed double time on tests was an inadequate

accommodation.  SUF, ¶ 77.  RMC told Pettigrew that anything more than double

time was unreasonable and would not be permitted.  SUF, ¶ 78.

RMC also subsequently determined that Pettigrew would not be able to retake the Epidemiology exam because she did not fail the exam and that her score on any examination retakes would be limited to 60%.  Although it was not a written policy, RMC capped retake examination grades at 60% in order to be fair to other students.  SUF, ¶ 81.  Pettigrew insisted she should be able to retake the Epidemiology exam and that she should not be limited to 60% on retakes.  RMC agreed to allow her to retake the Epidemiology exam, but maintained that the best grade she could get on a retake was 60%, the minimum passing grade.  SUF, ¶ 82.  Rather than proceed with these accommodations, Pettigrew withdrew from the PA Program and filed this lawsuit.

## III.   ANALYSIS

### A.   STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under the

governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact.  *Anderson*, 477 U.S. at 256-57.  Once the moving party has done so, burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial.  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008).  The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Id.*  The court should not weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson,* 477 U.S. at 249.

The parties agree that in order to succeed on either the ADA or the Rehabilitation Act claims, Pettigrew must prove she is (1) "disabled" and (2) "otherwise qualified" to remain a student in the PA Program,[1] citing *Zukle v. Regents of the Univ. of California,* 166 F.3d 1041, 1045, n.11 (9th Cir. 1999)

---

[1]At least for purposes of the instant motion, RMC does not contest that (3) Pettigrew was dismissed solely because of her disability, (4) RMC receives federal financial assistance (for Rehabilitation Act claims) or (5) that it is a public entity (for ADA claims).  *Zukle,* 166 F.3d at 1045.

(noting no significant difference between rights and obligations created by the ADA and the Rehabilitation Act). Although Pettigrew does not specifically address the elements of a MHRA claim, she does not contest RMC's assertion that these two elements are also essential for an MHRA claim because it is patterned after the Rehabilitation Act and Montana courts have looked to federal law in interpreting it. *See e.g. Hafner v. Conoco, Inc.,* 886 P.2d 947, 950-51 (Mont. 1994). Accordingly, summary judgment must be granted in RMC's favor if the undisputed facts establish that Pettigrew was neither "disabled" nor "otherwise qualified" to remain in RMC's PA Program. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986) (summary judgment appropriate where undisputed facts establish plaintiff will be unable to prove essential element of a claim).

**B.**    **PETTIGREW CANNOT PROVE SHE IS DISABLED BECAUSE HER IMPAIRMENTS DO NOT LIMIT HER ABILITY TO READ AND UNDERSTAND AS A WHOLE, FOR PURPOSES OF DAILY LIVING, AS COMPARED TO MOST PEOPLE**

Pettigrew is not necessarily disabled within the meaning of the relevant statutes solely on account of her learning disability. *Wong v. Regents of University of California,* 410 F.3d 1052, 1066, n.6 (9th Cir. 2005)("*Wong II*"). To qualify as disabled in the instant context, Pettigrew must prove her impairments substantially limit a major life activity. *Wong II,* 410 F.3d at 1063. A unanimous Supreme Court

has made clear that the terms "substantially" and "major" "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg. Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002).[2]  "Substantially" means considerably or to a large degree, precluding minor impairments. *Wong II,* 410 F.3d at 1064 (citing *Toyota,* 534 U.S. at 197).   "Major" means important.  "Major life activities" are those of central importance to daily life.  *Id.*

Pettigrew's asserted disability is her "inability to comprehend material, read, and understand."  SGI, ¶ 34.  This disability rendered her unable to understand the PA Program material and test questions.  SGI, ¶ 3.  As noted, she has been diagnosed with reading disorder, subtle ADHD and performance anxiety.  SUF, Exhibits 17, 18 & 28.  The evidence that Pettigrew's learning disabilities has interfered with her performance in the PA Program cannot be disputed.

---

[2]Although the ADA Amendments Act of 2008 ("ADAAA") legislatively overruled the "demanding standard for qualifying as disabled" announced by a unanimous Supreme Court in *Toyota Motor Mfg. Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002) and other cases, *Rohr v. Salt River Project Agricultural Improvements and Power District,* --- F.3d ---, 2009 WL 349788, *1 (9th Cir. 2009), the ADAAA is not retroactive.  *E.E.O.C. v. Argo Distribution LLC,* ----F.3d---, 2009 WL 95259, *5 n.8. (5th Cir. 2009).  This is because Congress must explicitly state when a statute overruling a Supreme Court opinion is to be applied retroactively.  *Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 313( 1994)("Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear").  Accordingly, since the alleged discrimination in this case occurred before January 1, 2009, the effective date of the ADAAA, the Court proceeds with the law as it was at the time the events occurred.

Regardless, the question of whether Pettigrew is disabled does not turn on whether she could persuade the trier of fact that her learning impairment makes it impossible for her to keep up with the curriculum of the PA Program, but whether she can prove that her impairment substantially limits her ability to read and understand as a whole, for purposes of daily living, as compared to most people. *Wong II,* 410 F.3d at 1065-66.

Here, RMC cites the undisputed facts that Pettigrew successfully graduated from college, was accepted to the PA Program, and obtained passing grades in several PA Program courses without accommodations.  RMC also notes that Pettigrew's own expert believes she has "very average academic skills," including average vocabulary and reading skills.  SUF, Exhibit 17.  He also has described her cognitive difficulties as "mild."  SUF, Exhibit 28.

RMC has satisfied its initial burden, so Pettigrew must set forth evidence raising a genuine issue of material fact as to whether she was substantially limited in her ability to learn "for purposes of daily living, or as compared to what is important in the daily life of most people."  *Wong II,* 410 F.3d at 1066.  Although the record is replete with evidence that Pettigrew's impairments substantially limited her ability to succeed in the PA Program, there is no evidence that they substantially limited her ability to read and understand for the purposes of daily living.  Such evidence

13

would be questionable considering that Pettigrew was admitted to a master's degree program that would authorize her to write prescriptions, conduct physical exams, diagnose and treat illnesses and essentially practice medicine under the tutelage of a licensed physician. Considering that Pettigrew has mild cognitive problems and average academic skills, labeling her "disabled" would be contrary to the demanding standards established by a unanimous Supreme Court.

The undisputed facts establish Pettigrew would be unable to prove she was disabled within the meaning of the relevant statutes. Accordingly, RMC must be granted summary judgment as to Pettigrew's ADA, Rehabilitation Act and MHRA claims.

**C. EVEN IF PETTIGREW COULD PROVE SHE IS DISABLED, SHE CANNOT PROVE SHE WAS OTHERWISE QUALIFIED TO REMAIN IN THE PA PROGRAM BECAUSE THE ACCOMMODATIONS SHE REQUESTED ARE UNREASONABLE**

As a threshold matter, the Court must first determine whether RMC's decisions concerning the accommodations afforded to Pettigrew are entitled to deference or whether this Court should evaluate them *de novo.* *Zukle,* 166 F.3d at 1047; *Wong v. Regents of the Univ. of California,* 192 F.3d 807, 820-21 (9th Cir. 1999) ("*Wong I*"). In the Ninth Circuit, judicial deference is extended to an educational institution's academic decisions unless the institution's standards, or its

application thereof, serve only to discriminate against disabled people. *Zukle,* 166 F.3d at 1047-48. Accordingly, to be afforded deference, RMC must show that it sought a suitable means of reasonably accommodating Pettigrew. *Wong I,* 192 F.3d at 817-818. Specifically, RMC must submit a factual record showing it investigated Pettigrew's disability, considered alternatives for accommodating her and exercised professional judgment in deciding whether those accommodations would provide Pettigrew an opportunity to complete the PA Program without fundamentally or substantially modifying its standards. *Id.*

Here, the record demonstrates that RMC bent over backwards to accommodate Pettigrew. *E.g.,* SUF ¶¶ 4, 7, 10, 17-22, 25, 27, 28, 32, 35, 41, 42, 45, 48, 50, 74, 76, 79 & 82. The first time Pettigrew had difficulties in the PA Program, she was allowed to withdraw, take refresher courses and re-enroll without any procedural hurdles. SUF, ¶¶ 4,6 & 7. Although she continued to struggle upon her return, she did not request accommodations from the PA Program even though she had received accommodations from RMC during her undergraduate studies. SUF, ¶¶ 13-14; SGI, ¶ 17.

RMC had the right to dismiss her for poor performance at the conclusion of the fall 2004 term, but it did not do so. SUF, ¶¶ 17-18. It referred her to the SPCC, which after providing her with the opportunity to document her disabilities and

request accommodations, offered her two options to continue in the PA Program.

SUF, ¶¶ 19-36.  Pettigrew chose the option whereby she was allowed to withdraw,

work with her psychologist on compensatory strategies, and start the PA Program

over again with a private testing room and 20% additional testing time.  SUF, ¶¶ 36,

39 & 42.  In notifying her of these accommodations, RMC told Pettigrew to provide

"specific information of any other learning disability accommodations" before she

returned to the Program.  SUF, Ex. 22.  The Director of the PA Program stressed the

need for Pettigrew to check with her doctors about further accommodations when

she notified Pettigrew of these accommodations.  SUF, Ex. 24.

Nonetheless, Pettigrew did not request any further accommodations until she

requested unlimited testing time in December of 2005.  This request came either

during or just before the fall 2005 final examinations.  SUF, ¶ 58.  RMC rejected

unlimited testing time because it believed such an accommodation would

compromise the integrity of its program.  SUF, ¶¶ 63-67.  Although RMC was again

authorized to dismiss Pettigrew at the end of the fall 2005 term, it upheld her appeal,

giving her the opportunity to retake two tests, including one that she did not fail, and

as much as double time for examinations.  SUF, ¶¶ 73-82.  Nonetheless, Pettigrew

found these accommodations insufficient and chose to withdraw.  SUF, ¶ 83.

In the Court's view, the record establishes that RMC satisfied its duty to gather information in order to determine what accommodations were necessary to enable Pettigrew to remain in the PA Program. *Wong I,* 192 F.3d at 818. Further, there is no evidence that RMC's refusal (1) to provide Pettigrew more than double time on exams or (2) to allow her to achieve a grade in excess of 60% was for the purpose of denying Pettigrew an education. *See Zukle,* 166 F.3d at 1047-48. Accordingly, RMC academic decisions are entitled to deference.

Having so concluded, the Court now considers whether Pettigrew can meet her burden of proving she was otherwise qualified to remain a student in the PA Program, with or without accommodations. *Zukle,* 166 F.3d at 1047. Considering that Pettigrew was unable to satisfy the PA Program requirements when she was taking her exams in a private room with 20% additional time, there is no question that she could not do so without accommodations. She must therefore prove the existence of a reasonable accommodation and that this accommodation would enable her to meet RMC's essential eligibility requirements. *Wong I,* 192 F.3d at 816 (citing *Zukle,* 166 F.3d at 1047). If Pettigrew can make this showing, the burden shifts to RMC to produce evidence that the requested accommodation would require a fundamental or substantial modification of its program or standards. *Id.* RMC could also satisfy its burden with evidence that Pettigrew's requested

accommodations, regardless of reasonableness, would not enable her to meet RMC's academic standards. *Id.* Despite these shifting burdens, Pettigrew retains the ultimate burden of proving she is otherwise qualified. *Id.*

Considering that (1) Pettigrew completed her undergraduate degree with unlimited testing time and (2) Dr. Tompkins believes increased testing time would have the same result as it did during her undergraduate years, Pettigrew has raised a genuine issue of material fact as to whether she was otherwise qualified to remain in the PA Program if RMC had allowed her unlimited time for examinations.

As a second requested accommodation, Pettigrew claims she would be otherwise qualified to remain in the PA Program if RMC would have waived the 60% limitation on examination retakes. RMC argues this accommodation should not be considered because Pettigrew never actually requested this as an accommodation. While RMC is correct that Pettigrew did not request a waiver of the 60% limitation when she first requested unlimited examination time in December of 2005, she requested this accommodation in January of 2006 when she was complaining about the terms RMC imposed in upholding her appeal. SUF, Exhibit 40. RMC declined this accommodation because it believed it would be unfair to other students to allow Pettigrew to retake examinations without any penalty. SUF, ¶ 81.

However, Pettigrew offers no evidence that she could satisfy the PA Program's essential academic requirements if RMC had allowed her to retake examinations without penalty.  In her very brief treatment of this issue, Pettigrew argues only that capping the retakes at 60% prohibited her from redressing the ill-effects of RMC's failures in accommodating her.  *Doc. 15, p.16.*  More importantly, Pettigrew's deposition testimony was that unlimited time is the only way she could finish the tests because the time limit would cause stress and prohibit her from answering all the questions.  SUF, ¶ 61.  In light of Pettigrew's admission that unlimited time was the only accommodation that would make any difference, she will be unable to prove that she would be able to continue in the PA Program without the 60% limitation on exam retakes.

In any event, whether or not Pettigrew could maintain the PA Program's essential requirements with these accommodations is irrelevant because those accommodations were unreasonable–they would require a fundamental and substantial modification of the standards of the PA Program.  *See Wong I,* 192 F.3d at 816.  Because reasonableness is not a constant, the Court must consider Pettigrew's requested accommodations in light of the totality of the circumstances.  *Zukle,* 166 F.3d at 1048.  Again, RMC's decision that these accommodations were unreasonable is entitled to deference.

19

Here, the undisputed fact is that no PA Program student has ever been afforded unlimited time for examinations.  SUF, ¶ 64.  This is because RMC believes that examinations without time limits are incompatible with a master's program designed to train physician's assistants, who are required to think and act quickly and accurately in emergency situations.  SUF, ¶ 65.

Further, timed examinations allow RMC to evaluate whether a student can respond quickly and accurately when confronted with time pressures.  This type of evaluation is crucial to determining whether RMC is training competent physician's assistants.  SUF, ¶ 66.  Finally, PA Program graduates must pass the PANCE exam to work as physician's assistants.  Since the PANCE exam caps accommodations at double time, SGI, ¶ 36, allowing Pettigrew unlimited time would not prepare her for this essential examination.

In the Court's view, RMC's refusal to allow untimed examinations reflects a reasoned judgment to which this Court will defer.  But regardless of deference,  this Court would still conclude that unlimited time for examinations in a master's program for physician's assistants is unreasonable where unlimited time would not be allowed for the PANCE exam.  This is especially true for a student whose own psychologist has diagnosed her with mild cognitive difficulties and average academic skills.

For the record, Pettigrew's request for uncapped retakes on the Epidemiology and Pathophysiology exams was also unreasonable.  RMC went above and beyond what is required by even allowing Pettigrew to retake the exams in the first place. To make an exception and allow Pettigrew to retake examinations without any penalty would be unfair to other students. This decision represents the sound judgment of academic professionals and is therefore reasonable.

## IV.   CONCLUSION

Although the PA Program at RMC has a statutory duty to accommodate disabled students, it also has a duty to ensure the academic integrity of its programs, both for the other students and the patients who will be treated by its graduates. The undisputed facts of this case establish that RMC complied with those duties and that Pettigrew will be unable to satisfy two essential elements of her claims.  For those reasons, **IT IS HEREBY ORDERED** that Rocky Mountain College's Motion for Summary Judgment (*Doc. 10*) is **GRANTED** in its entirety.

The Clerk of Court shall notify the parties of the entry of this order and enter judgment accordingly.

Dated this 17th day of February, 2009.

_/s/ Richard F. Cebull_____
Richard F. Cebull
United States District Judge

21